UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------×

SERENA WONG,

               *Plaintiff,*

        v.

BDO USA, P.C., TARA LEBERMAN, BINITA PRADHAN,
and MARK LUNDIN,

               *Defendants.*

----------------------------------------------------------------------×

**26-CV-3393**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Serena Wong, by her attorneys, Young & Ma LLP, complains of Defendants as follows:

**PRELIMINARY STATEMENT**

1.     Plaintiff Serena Wong ("Plaintiff' or "Ms. Wong") seeks damages and costs against Defendants BDO USA, P.C. ("BDO" or the "Company"), Tara Leberman ("Tara"), Binita Pradhan ("Binita"), and Mark Lundin ("Mark")(collectively, "Defendants") for discriminating and retaliating against her based on race, sex, familial status, parental status and caregiver status; and perpetuating pervasive race, sex, familial status, parental status and caregiver status stereotypes; in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §2000e *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.

2.     Plaintiff also seeks damages and costs against Defendants for failing to pay her equally as to her comparative male or non-Asian or non-familial colleagues, which provide similar or the same work and have similar or the same credentials and experience as Plaintiff, and for retaliating against her for exercising her rights in violation of N.Y. Labor Law § 194 ("NYLL").

3. Plaintiff also seeks damages and costs against Defendants for unlawfully interfering with her exercise of her rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 *et seq.*, and retaliating against her for exercising her FMLA rights by terminating her employment.

## JURISDICTION AND VENUE

4. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiff's claims, as Defendants violated Plaintiff's rights under Title VII and FMLA.

5. Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about July 24, 2025.

6. On or about August 14, 2025, Plaintiff requested from the EEOC a right to sue, which was issued on January 28, 2026.

7. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's NYSHRL, NYCHRL, and NYLL claims as they are so related to the Title VII and FMLA claims that they form part of the same case or controversy.

8. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

## PARTIES

9. Plaintiff, at all times relevant hereto, was and is a resident of Queens County in the State of New York.

10. Upon information and belief, at all times relevant hereto, Defendant BDO USA, P.C. was and is a U.S. corporation incorporated in Virginia with an office in New York City.

11. Upon information and belief, Defendant Tara Leberman is an individual residing in New York and works in New York for BDO.

2

12.     Upon information and belief, Defendant Binita Pradhan is an individual residing in New York and works in New York for BDO.

13.     Upon information and belief, Defendant Mark Lundin is an individual residing in New York and works in New York for BDO.

## STATEMENT OF FACTS

14.     BDO delivers assurance, tax, and advisory services.  It has $2.89 billion U.S. revenue, 12,000+ employees, and 70+ offices nationwide.

15.     During her tenure, Ms. Wong managed a $3.5 million book of business and performed over 500 combined Statement on Auditing Standard No. 70 ("SAS 70")/System Organization Control ("SOC"), 1, 2 (Type 1 and Type 2), and 3 engagements for clients; worked on the quality internal initiative team to standardize SOC 1, 2 (Type 1 and Type 2), and 3 report templates, implemented Hyperproof, a third party online audit management tool for the Third Party Attestation ("TPA") National team by setting up demonstration meetings and trainings; led in the learning and development internal initiative team by managing the development of the TPA Internal Hub website and outline required training for MD and Partner levels based on required competencies; built a team from ground up and continuously recruited new team members from associate to senior manager levels; day to day responsibilities included training and leading a team of over 40 team members nationally and internationally; had an extensive background in all stages of engagements including scheduling, planning, analysis, and testing of controls, reporting, and post mortem follow up; prepared examination scopes, reported findings and presented recommendations to clients for improving data integrity and operations; ensured engagement tasks were completed accurately and within established timeframes; possessed executive presence and liaised between in house partners, clients' C-level executives, Information Technology ("IT") and

operational department members; presented and facilitated the identification and resolution of risk and control issues; identified and evaluated risks during review and analysis of business operations, security, System Development Life Cycle ("SDLC"), including design, testing/quality assurance ("QA") and implementation of systems and upgrades; was responsible for engagement profitability, including billings and collections, and maintaining engagement team focus on productivity and efficiency; provided mentorship and guidance to college students on career objectives, and engaged in peer mentoring circle to promote inclusivity, diversity and share insights, experience in leadership, work-life balance and career journey.

16.    Between 2011 and 2016, when the Company supported the Parents Network Initiative, Ms. Wong was very active posting topics and monthly meetings with other BDO parents to discuss work life balance and provide/receive tips.  In 2021, she became active in the monthly virtual Multi-Cultural Alliance sessions held by the Bay Area and other offices.  In 2023, Ms. Wong was a volunteer career mentor through BDO to an Asian American college sophomore applying for internships and in 2024, she was involved in the National Asian Alliance initiative.  Plaintiff was a true success both in her substantive delivery at work and the initiatives she engaged in.  This is especially so when considering her compensation and where she was qualified for further promotion years before.

17.    Ms. Wong came to BDO from the NYC Comptroller's Office with significant auditing experience in 2004.  She has a Bachelor of Science in Accounting and is very committed to her trade.  In terms of certifications and credentials, Plaintiff has the following:  Certified Information Systems Auditor ("CISA"), Certified Information Security Manager ("CISM") and Certified in Risk and Information Systems Control ("CRISC"), HITRUST Certified Common Security Practitioner ("CCSFP").  At BDO, she worked her way up from Assurance Experienced Senior

(2004) to Assurance Manager (2005) to Assurance Senior Manager (2007), and then Assurance Director (2015) and Managing Director (2022).  From the beginning, Ms. Wong had strong reviews under Larry Bakst ("Larry") and Sheryl Skolnik, which was noticed by Defendant Tara, who was poached and grabbed Plaintiff into her group by Fall 2005.  Tara successfully pitched for Ms. Wong to transfer to the San Francisco team.  She capitalized on Plaintiff's skillset but never gave Ms. Wong the proper credit, as further explained below.

18.     Defendant Tara clearly needed Ms. Wong's IT expertise to work on SAS 70 reports but did not provide any upward mobility in exchange.  In fact, Tara structured it so this was essentially Plaintiff's exclusive role and provided no front facing opportunities, which is traditionally what stereotypically happens to Asian (and female) employees.  Tara provided a wall between Ms. Wong and her own boss, Bill Leroy ("Bill").  Much of Plaintiff's work was reported by Tara to Bill as Tara's own to advance her own career.  Tara also made herself the exclusive person to issue reports to clients and took all the credit there.  Meanwhile, Ms. Wong was traveling to all client sites, standardizing the entire IT section of 50 clients reports across different US offices and developed the client relationships. This is senior sophisticated business side work for a more senior leader.  Meanwhile, Plaintiff's work was not recognized.

19.     In February 2006, Ms. Wong won a client, Mincom, located in Brisbane, Australia for just her IT only report.  But this business development was also not rewarded.  Plaintiff made efforts to inform Defendant Tara about IT general controls, BDO's IT methodology and IT industry standards.  In July 2006, Tara shifted to report to Craig Linnell ("Craig").  Due to wanting to impress her new Partner, Tara began to take even more credit for Ms. Wong's work in front of a new Partner less familiar with the inner workings of the group.  In this year, Plaintiff got her CISA

certification and was promoted to Experienced Manager in title only but was still treated the same by Tara.

20.     In February 2007, Ms. Wong was out of the office for 9 weeks for maternity leave. Defendant Tara (who has no children) asked questions and requested her to work during this time (i.e., work but not bill the hours).  Simultaneously, Tara was promoting a male Asian associate to senior associate.  Tara continued to shut Plaintiff out and worked closely with Craig in key decision making on scheduling, recruitment, and client fees even after Ms. Wong became a Senior Manager.

21.     In 2008, Ms. Wong continued to travel and work with clients in issuing reports and it was clearly time for her to make Partner as she proved her technical capabilities and also business development/client relationship capabilities.

22.     In 2009, when Defendant Tara became a Partner (single, no children) due largely to Ms. Wong's work, Plaintiff stayed a Senior Manager.  Later, she discovered that Tara attended the 12-18 month Business Leadership Institute (BLI) training where personal coaches, mentoring and networking opportunities were offered with the intention of promoting Senior Managers to Partners.  Therefore, to the extent Tara had good business leadership skills using the Company's metrics, BDO was also harnessing that.  But in terms of actual dollars developed and direct client capabilities, Ms. Wong had plenty of that proven experience already within the Company.

23.     In 2009, Ms. Wong also had her second child and took her second maternity leave.  Again, she received many calls from Defendant Tara and was pressured not to bill the hours.  Plaintiff's 13 week maternity leave was split in two to meet client deadlines.  Tara repeatedly complained that 13 weeks was excessive as the previous policy was 0 weeks.  Tara was very upset over something that was the national industry standard.  She would make comments that no one can meet these deadlines given the "extended" maternity leave policy.  Many companies offer 6

months and most especially in a second child scenario where a primary caretaker has to manage the older toddler while having a newborn. The adjustment to second time motherhood is much more involved. Nevertheless, due to this pressure, Ms. Wong took 10 weeks off initially and the remaining 3 weeks six months later. She seamlessly supported Allstate, Charles Schwab, ePlan, Genworth, Global Shares, Karr Barth Administrators, Milliman, Mincom, Perfect Commerce, and USI Consulting Group, among others, this year. Plaintiff did not get credit for the hours she worked during maternity leave (in that critical 10 weeks that should have been bonding with her newborn child and helping the older child to adjust). She just continued to perform to keep her (childless) boss happy but yet was not included or invited to meetings. Ms. Wong was continuously pressured to underbill her time (i.e., bill only 8 hours a day although working well over). Normalizing this practice came to hurt Plaintiff towards the end of her employment where low utilization was mentioned.

24.     At one point, Ms. Wong was told she can go to Business Leaders Meetings, which is important for her promotion. Defendant Tara started making excuses that Plaintiff's pick up/drop off schedule for children impacted her ability to be included in critical meetings. Tara additionally frequently met with Partners, including Craig, Brian Minnihan ("Brian"), Kevin Bianchi, Doug Hart, and Slade Fester, in happy hours (drinking opportunities) during conferences that involved socializing/drinking. Ms. Wong's lack of inclusion was due to not drinking, being a mother of young children, and life preferences. This is clearly also a lifestyle more suitable for a single woman without children. She was excluded from many socializations during conferences like the National Leadership Conference every year, especially around when she was having children November 2006 to 2009.

25.     In April 2010, Defendant Tara left to Colorado National Bank as Chief Information Officer, again promoting Ms. Wong's IT knowledge as her own.  She would not have had the technical side experience without promoting Plaintiff's work.  Worse, even upon departure, Tara did not correct Craig's mistaken understanding of Ms. Wong capabilities, which she created during her time at BDO to promote herself.  Tara even said upon departure that she does not recommend Plaintiff be promoted but that instead Senior Manager Defendant Binita from another group should lead the SAS 70 practice.  Tara simply did not want her inferior competence to Ms. Wong discovered.  Clearly, this started Binita's supervisory role of Plaintiff in a conflict of interest as she knew Ms. Wong was qualified to do her job.  Early on, in many of the road shows, she showed Binita the ropes in methodology, documenting, and client billing. Plaintiff had to introduce her to all clients and give her the book of business and client relationships Ms. Wong built.  Binita unsurprisingly continued the style of meeting alone with Craig, shutting Plaintiff out and giving her no credit.  Binita also drinks and occasionally smokes and is much more social with people in BDO due to the drinking and smoking.  Again, Ms. Wong does not drink as she does not enjoy it based on her life preference.  There was much more of a White fraternity/sorority culture who accepted women that fit into that only (and is harder for mothers of younger toddlers with different lifestyle choices).  Binita goes out for dirty martinis/wine with Partners including Craig, Brian, Christopher Tower ("Christopher"), Jeff Ward, Rick Scarfino, and Johnson Wong ("Johnson") and is also better included at national leadership conferences and trainings, dinners, and SAS 70 trainings.  The next day after these drinking sessions and White fraternity/sorority culture, conversations were frequently surrounded on the competition on who drank the most, who stayed out the latest, and who slept the least.  As Plaintiff does not drink, she would hear these side discussions but not be able to contribute or bond with this culture.

26.     In 2011, following the same discriminatory roadmap of Defendant Tara, Defendant Binita was also promoted to Partner due to Ms. Wong's work.  She utilized Plaintiff's experience, client connections, and network to promote herself.  She was also invited to and attended BLI training and BDO hired a personal coach for her.  In 2011, Ms. Wong discussed with Binita for her to attend BLI.  In a turn from how this was ever handled, Binita suddenly suggested Plaintiff bring this up with Brian and did not advocate for her at all, even though she knows Ms. Wong was more qualified than her and Binita only got promoted and included due to Plaintiff's knowledge and experience.  There could not be any clearer sign of a manager and the manager above Ms. Wong not being supportive of a long term Asian/mother employee.

27.     Immediately after this request in November 2011, suddenly Craig and Defendant Binita said that project realizations were set up on unrealistic hours that led to write offs and upper management attention.  This was done to make Ms. Wong adjust hours on client engagements to administrative time to avoid write offs but this made her look bad to upper management and easier to fire.  These and ongoing actions after Plaintiff made clear she wanted a promotion is related to the low utilization/billing referenced within the 1-2 years of her termination.  It is also a classic way to treat an Asian female employee that spoke up and wanted more than what is given.  Therefore, knowing Ms. Wong's advanced qualifications and hitting a bamboo ceiling and qualification to be Partner, her managers took actions to deliberately sabotage her so it would not be discovered she essentially built and supported the whole group. In 2011, Plaintiff had also filed for worker's compensation and consistent with lack of coverage while on maternity leaves, she was also so busy with client deadlines and lack of support in a silo that she could not properly attend her physical therapy sessions.

28.     In 2012, Ms. Wong mentioned BLI a lot and in October, Christopher even announced on a call with key Partners that Plaintiff was next to attend in 2013.  Then when it came time, another excuse arose that each region has a limited number for BLI and Ms. Wong was not high up enough to go.  No further explanation as to ranking or selection for "high up" was given (or the fact that she'd been waiting years).

29.     In April 2013, Defendant Binita was allowed to leave work at 4 pm to pick up her children and yet made it very hard for Ms. Wong to pick up children even at 5:40 pm.  Four days later (again related to child accommodation needs), Binita blamed her for working on engagements prior to an engagement letter being signed but they were in Binita's queue for days and delayed due to her review.  Obviously, it's bad business to make a client wait due to a Partner refusing to review her emails.  These were all pretextual negative reviews due to Plaintiff's childcare requests and retaliation for wanting a rightful earned promotion.  In September 2013, Ms. Wong had to take client calls at her mother in law's funeral because Binita was not familiar with the client.  In 2013, Plaintiff needed a medical procedure and consistent with harassment whenever she took maternity (or any) leaves, Binita and Craig invasively asked about the type of surgery and recovery allegedly due to client deadlines.

30.     In 2014, Ms. Wong took a different turn and discussed being a Director even if everyone else went from a Senior Manager directly to a Partner (i.e., Defendant Binita and Defendant Tara).  All other team members with her tenure at this point, including but not limited to Tara, Johnson, Larry, and Binita, had been promoted to Partner in a shorter time.  Plaintiff was finally granted the lesser position of Director in 2015.

31.     In 2015, once again the excuse for not including Ms. Wong in BLI was that the Company acquired Stone Carly and still others were ahead of her.  The same excuse was used for 2016.  In

this year, Christopher, who promised BLI in 2013, was promoted to National Managing Partner and no longer responsible for the West region and hence Plaintiff lost the person championing for her since 2012. Louis Van Der Westhuizen ("Louis"), who is the same age and lesser qualified, was promoted to MD in August 2016 and left BDO 4 years later. He had managed the southern CA clients. Suddenly, after years of employment, the department pushed Louis in getting a CPA and developing business to take over Craig's role. Ms. Wong was never encouraged like this, even with the years of technical experience, accreditation, and client experience.

32.     In 2018, Ms. Wong traveled to the Palo Alto Networks engagement in San Jose and performed exceptionally well and the client was very happy with her work, relationship building, team management, and project timeline. Once again, Plaintiff was never appreciated by her managers/BDO for this.

33.     In 2019, BDO did not renew Ms. Wong's HiTRUST certification but later then allowed Josh Ayes (White male) to continue the line of service instead. In 2019, instead of promoting her to Partner, BDO hired Mark (White male), who is the same age as Plaintiff, to be a Partner. Defendant Binita then hired Kishan Sathyanarayanan ("Kishan"), who is a 15 years younger Indian male, and promoted him also to MD 4 years later and asked him to look over Palo Alto Networks and take that away from Ms. Wong. He got to MD with 4 years as Experienced Manager while it took her 8 years from Experienced Manager to Senior Manager to MD and with constant demands (and retaliation). Plaintiff is much more experienced than Kishan and Defendant Mark in executive presence, leadership skills, team building, client relationships, BDO's methodology, and risk management.

34.     In 2020, BDO would not send Ms. Wong to BLI due to the pandemic. Defendant Mark and Defendant Binita then hired Eddie Sison, another Southeast Asian male 8 years younger, as

11

Senior Manager and promoted him to MD in 2 years and he was assigned Adobe and SAP clients. He was promoted to MD in 2 years and it took Plaintiff 7 years from Senior Manager to MD and with demands (and retaliation).

35.    In 2021, Defendant Binita hired Varun Prasad ("Varun"), 5 years younger Indian male, as Experienced Manager and promoted him to MD in August 2024.  He was assigned the CISCO account and promoted to MD in 3 years while it took Ms. Wong 8 years from Experienced Manager to Senior Manager and MD.  She was consistently shut out of client work like CISCO by Eddie, Defendant Mark, and Binita, who was beginning a campaign of removing billable work to set me Plaintiff for eventual termination due to underutilization.

36.    In 2022, BDO standardized all TPA titles from Assurance Director to MD, so all Ms. Wong's work to be promoted now meant a lot less.  In 2022, Defendant Binita then hired Michael Deeming ("Michael"), 5 years younger, as MD, and trained him to take over Craig's role as Louis left BDO.  Craig passed away the end of that year.

37.    In 2023, Craig's book of business was assigned to Michael that Ms. Wong had primary contact with.  In September 2023, clients like Global Shares still requested that she work onsite and be the primary contact based on the many years of experience.  Global Shares, USI Consulting, Perfect Commerce, and Milliman preferred working with Ms. Wong.  Michael was introduced to Milliman, Plaintiff's largest client and expected to take it over in 2024.  The excuse was the need for a CPA while the company proactively supported it for others and so Ms. Wong also took her first part of the CPA exam in mid 2024.  During this time, Plaintiff's managers removed Adobe, SAP, and CISCO work away from her and yet did not adjust billable hour requirements.  Knowing her long history of demanding rightful promotion and equal treatment, now Ms. Wong's department will be without an excuse about her partnership.  So much of her work, dedication,

loyalty, and credit was always stolen from Plaintiff after she succeeded (very consistent with the story of Asian Americans and especially Chinese Americans in this country). Ms. Wong was experienced enough to train others for over 20 years and less experienced members have all been promoted over her. Experienced clients will still prefer Plaintiff and she knows the ins and outs of internal controls and SOC reporting better. Because Defendant Binita was attempting to transition Milliman to someone else, Milliman informed Binita they are not renewing in 2025 as they found a more cost effective solution, showing they were paying more due to Ms. Wong's work. Binita and Defendant Mark would sabotage the profitability of BDO to ensure their discriminatory and retaliatory employment decisions.

38. Defendant Binita started to promote the South Asian men she hired that were lesser experienced but of same race to her over Ms. Wong (i.e., Kishan and Varun). They were consistently given preferential client assignments. Clearly, Binita preferred White and Indian men.

39. In the years Ms. Wong worked, her husband had been employed by BDO and left in January 2015 due to seeing White males promoted over himself. He witnessed East Asian employees doing more work with no reward. Plaintiff witnessed Anh Nguyen (early 30s married Vietnamese female with a child) who she also trained not get recognized or acknowledged quickly like Defendant Mark. Narc Ganac, a Filipino male in his 30s, would notice that others like Mark were unfairly given the partner title upon hire.

40. Ms. Wong was wrongfully terminated on October 1, 2024.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Race and Sex Discrimination and Hostile Work Environment**
**in Violation of Title VII**
**(Against Defendant BDO)**

41.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

42.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e) et seq., for relief based upon the unlawful employment practices of Defendant BDO.

43.    BDO was Plaintiff's "employer" within the meaning of Title VII.

44.    Plaintiff was a female "employee" of BDO and is a member of protected classes within the meaning of Title VII.

45.    At all relevant times, the Company was aware of Plaintiff's race and sex.

46.    By the conduct alleged in this Complaint, BDO discriminated against Plaintiff with respect to the compensation, terms, conditions and privileges of her employment because of her race and sex.

47.    Plaintiff was subjected to a pervasive hostile work environment by the Defendant's conduct.

48.    The Company engaged in unlawful employment practices prohibited by Title VII because of Plaintiff's race and sex in the manner described in the Statement of Facts.

49.    Plaintiff suffered adverse employment actions and continuing damage by the Defendant due to her race and sex and the hostile work environment that Plaintiff suffered at BDO because of her race and sex.

50.    As a direct and proximate result of the Company's unlawful and willful conduct, Plaintiff has suffered and will continues to suffer the loss of income and damage to reputation.  Plaintiff has also suffered and/or will suffer future pecuniary losses, attorney's fees and costs, emotional and physical pain and suffering, inconvenience and other non-pecuniary losses.

51.    As a further direct and proximate result of the Company's unlawful and willful conduct, Plaintiff has suffered and will continue to suffer, among other things, impairment and damage to her good name and reputation, emotional distress, physical injury, mental anguish and lasting embarrassment and humiliation.

52.    Plaintiff is entitled to recover, inter alia, monetary damages and other damages and relief, including, but not limited to back pay, front pay, punitive damages, reasonable attorney's fees, emotional distress damages and compensatory damages from BDO under Title VII.

**SECOND CAUSE OF ACTION**
**Race, Sex, and Familial Status Discrimination and Hostile Work Environment**
**in Violation of NYSHRL**
**(Against All Defendants)**

53.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

54.    This Count is brought under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 et seq., and reference is made to the NYSHRL in its entirety.

55.    At all relevant times, the Company was Plaintiff's "employer" within the meaning of the NYSHRL.

56.    At all relevant times, Plaintiff was an "employee" of BDO within the meaning of the NYSHRL.

57.    At all times, Defendants were aware of Plaintiff's race, sex, and familial status.

15

58.     Defendants engaged in unlawful employment practices prohibited by the NYSHRL because of Plaintiff's race, sex, and familial status in the manner described in the Statement of Facts.

59.     Plaintiff is severely limited in her career by Defendants' unlawful conduct due to her race, sex, and familial status.

60.     Defendants' conduct, as alleged herein, constitutes unlawful discriminatory practices and unlawful discrimination on the basis of sex and familial status, as defined by the NYSHRL, by engaging in, causing, perpetrating, committing, authorizing, directing, participating in, aiding, abetting, inciting, compelling and/or coercing the unlawful conduct alleged herein, or attempting to do so, in violation of the NYSHRL.

61.     Defendants are also individually and jointly liable for the unlawful conduct herein, including, without limitation, as an "employer" under the NYSHRL and under the "aiding and abetting" provision of the NYSHRL.

62.     Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Executive Law Section 296.

63.     Plaintiff's damages include, inter alia, financial loss, loss of employment opportunities, damage to her career and professional reputation, and severe emotional distress caused by the degrading conduct and loss of employment opportunities.

64.     Plaintiff is entitled to recover monetary damages and other damages and relief, including, but not limited to, back pay, front pay, compensatory and punitive damages, and costs and attorney's fees from Defendants under the NYSHRL.

**THIRD CAUSE OF ACTION**
**Race, Sex, and Parental Status/Caregiver Status Discrimination and Hostile Work Environment**
**in Violation of NYCHRL**
**(Against All Defendants)**

65.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

66.    This Count is brought under the NYCHRL, N.Y.C. Admin. Code § 8-101 et seq., and reference is made to the NYCHRL in its entirety.

67.    At all relevant times, Defendants were an employer and person within the meaning of the NYCHRL.

68.    At all relevant times, Plaintiff was an employee and person within the meaning of the NYCHRL.

69.    At all times, Defendants were aware of Plaintiff's race, sex, parental, and caregiver status.

70.    Defendants engaged in unlawful employment practices prohibited by NYCHRL because of Plaintiff's race, sex, parental and/or caregiver status in the manner described in the Statement of Facts.

71.    Defendants engaged in, caused, perpetrated, committed, authorized, directed, participated in, aided, abetted, incited, compelled and/or coerced the unlawful conduct alleged herein, or attempted to do so, in violation of the NYCHRL.

72.    Defendants' conduct, as alleged herein, was carried out with malice or reckless disregard for Plaintiff's protected rights to be free from discrimination and a hostile work environment.

73.    Defendants are individually and jointly liable for the unlawful conduct herein, including without limitation as an "employer" and "employee" under the NYCHRL and under the "aiding and abetting" provision of the NYCHRL.

17

74. As a direct and proximate result of Defendants' unlawful and willful conduct, Plaintiff has suffered and continues to suffer injury, with resulting monetary, economic and other damages, including without limitation, lost wages, lost back pay, lost benefits, lost bonuses, interest on the foregoing, and attorney's fees and costs.

75. As a further direct and proximate result of Defendants' unlawful and willful conduct, Plaintiff has suffered and continues to suffer, among other items, impairment and damage to her good name and reputation, emotional distress, mental anguish, emotional and physical pain and suffering, and lasting embarrassment and humiliation.

76. Plaintiff is entitled to recover monetary damages and other damages and relief, including compensatory and punitive damages, interest, and attorney's fees and costs from Defendants under the NYCHRL.

**FOURTH CAUSE OF ACTION**
**Violation of New York State Labor Law § 194**
**(Against All Defendants)**

77. Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

78. Plaintiff is an "employee" of BDO as defined under N.Y. Lab. Law § 190(2).

79. Defendants are "employers" as defined under N.Y. Lab. Law § 190(3).

80. Defendants knowingly, willfully and intentionally paid Plaintiff less than her co-workers performing substantially similar work due to Plaintiff's sex.

81. Defendants' disparate treatment of Plaintiff with respect to her compensation is not based on any legally-recognized differential or bona fide factor, but rather is based on Plaintiff's status in protected classes.

82.     The facts supporting unequal pay and terms and conditions of employment are further outlined in the Statement of Facts.

83.     As a result of Defendants' unlawful conduct in violation of the N.Y. Labor Law, Plaintiff is entitled under N.Y. Lab. Law § 198 to recover the full amount of the underpayment, her reasonable attorney's fees and costs, prejudgment interest and liquidated damages up to three hundred percent of the total amount of the wages due for Defendants' willful violation.

**FIFTH CAUSE OF ACTION**
**Retaliation in Violation of Title VII**
**(Against Defendant BDO)**
**and the NYSHRL and NYCHRL**
**(Against All Defendants)**

84.     Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

85.     Defendant BDO violated Title VII, and all Defendants violated the NYSHRL and NYCHRL, because they knowingly retaliated against Plaintiff for objecting to the discrimination at BDO, as alleged in the Statement of Facts above.

86.     Defendants were aware that Plaintiff engaged in the protected activities alleged above.

87.     Because of her protected activities, Defendants took retaliatory adverse employment actions against Plaintiff as alleged in the Statement of Facts above.

88.     The unlawful retaliation against Plaintiff by Defendants was done with malice and reckless indifference to Plaintiff's protected rights.

89.     As a direct and proximate result of the unlawful retaliation by Defendants, Plaintiff has suffered damage to her career path, adverse job consequences, including economic damages, and continues to suffer damages, including severe mental, physical and emotional stress, pain and

suffering, anxiety, stress, humiliation, loss of enjoyment of life and damage to her reputation and career.

## SIXTH CAUSE OF ACTION
### Retaliation in Violation of the FMLA
### (Against All Defendants)

90.     Plaintiff hereby realleges and incorporates each and every allegation contained in the complaint with the same force as though separately alleged herein.

91.     The FMLA prohibits an employer from retaliating against an employee for exercising, or attempting to exercise, their rights under the FMLA.

92.     Defendants retaliated against Plaintiff for her exercise of her rights under the FMLA as further described in the Statement of Facts and by terminating her employment shortly after her leave.

93.     As such, Defendants have violated the FMLA.

94.     As a direct and proximate consequence of Defendants' discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, economic loss and liquidated damages, all in amounts to be determined at the hearing of this action.

95.     Defendants' discriminatory conduct was willful and in reckless disregard of Plaintiff's protected rights.  As such, Plaintiff is entitled to an award of punitive damages.

## JURY DEMAND

96.     Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff demands a judgment against Defendants as follows:

A.      Issue a declaratory judgment declaring that the actions of the Defendants, as set forth in this Complaint, violated:  (i) Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; (ii) the New York State Human Rights Law, N.Y. Exec. Law. § 290 et

20

seq.; (iii) the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.; (iv) the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*; (v) N.Y. Labor Law § 194; and (vi) that Defendants' foregoing acts of discrimination, harassment, and retaliation against Plaintiff were intentional and willful.

B.      Enjoin and restrain the Defendants and all persons acting on their behalf, or in concert with them, from engaging in such unlawful discriminatory and retaliatory practices;

C.      Enter judgment in favor of the Plaintiff, and against the Defendants, for back pay, front pay, and lost benefits, including, among other things, in the amount of the wages and bonuses it is determined that the Plaintiff lost as a result of the Defendants' unlawful, discriminatory and retaliatory conduct, together with interest;

D.      Enter judgment in favor of the Plaintiff, and against the Defendants for compensatory damages, including but not limited to, damages for Plaintiff's mental anguish, humiliation, lack of self-respect, emotional and physical pain, suffering and illness, together with interest;

E.      Award the Plaintiff punitive damages;

F.      Award the Plaintiff liquidated damages;

G.      Award the Plaintiff reasonable attorney's fees, interest, and expenses together with the costs of this action;

H.      Award such other and further legal and equitable relief as may be appropriate to redress fully the deprivation of the Plaintiff's rights under the laws cited herein, to prevent their recurrence in the future and to protect other employees from such unlawful behavior; and

I.      Such other and further relief as the court deems appropriate to be determined at

trial.

Dated: New York, New York
       April 24, 2026

                                        Respectfully submitted,


                                        By: _____
                                            Tiffany Ma, Esq.
                                            Young & Ma LLP
                                            445 Park Avenue, 9th Floor
                                            New York, NY 10022
                                            T: 646-379-7703
                                            F: 866-839-4306
                                            tma@youngandma.com